<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-2(c)

**WASSERMAN, JURISTA & STOLZ, P.C.**
**225 Millburn Avenue - Suite 207**
**P.O. Box 1029**
**Millburn, New Jersey 07041**
**Phone: (973) 467-2700**
**Fax: (973) 467-8126**
**Counsel to Debtor**
**LEONARD C. WALCZYK, ESQ. (LW-4720)**

In Re:

**WALSH SECURITIES, INC.,**

                                    Debtor.

</td><td>

Case No.: 10-44845

Hon. Novalyn L. Winfield

Chapter: 11

Hearing Date: July 5, 2011 at 10:00 a.m.

</td></tr>
</table>

## DEBTOR'S OBJECTION TO FIRST AMENDED DISCLOSURE STATEMENT FILED BY CHEROKEE EQUITIES, LLC

Walsh Securities, Inc. ("WSI" or "Debtor"), hereby submits this Objection (the "Objection") to the First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code (the "Disclosure Statement") Describing a First Amended Plan of Reorganization Proposed by Cherokee Equities, LLC (the "Plan"), dated June 20, 2011. In support of the Objection, the Debtor respectfully submits as follows:

### BACKGROUND

1.      The Debtor incorporates by reference the objections to the original Disclosure Statement filed by Cherokee Equities. See Docket Entry No. 46. The First Amended Disclosure Statement fails to remedy the deficiencies as previously described in the Debtor's Objection to the original Disclosure Statement.

2.      The Debtor was formerly a large mortgage business, with fourteen (14) offices in twelve (12) states, approximately 175 employees and over 1,600 independent brokers. The

Debtor at one time produced over $660 million of mortgages a year.

3.      Robert Walsh is the President, sole officer, director and majority owner of WSI. Prior to forming WSI, Mr. Walsh was the President of Carteret Savings Bank, which was New Jersey largest savings and loan.

4.      In 1997, WSI commenced an action in the United States District Court for the District of New Jersey, against a multitude of defendants.  In its Complaint, Walsh alleges that it was the victim of a fraudulent scheme perpetrated by a large number of mortgage companies, real estate appraisers, attorneys and title companies, which ultimately induced WSI to purchase a large number of loans on real properties where the prices had been inflated.  This fraud scheme ultimately led to the demise of WSI.

5.      Robert Walsh has never been implicated in any of the wrongdoing, and in fact, has spent the last thirteen (13) years of his life pursuing redress against the perpetrators of the fraud through the aforementioned litigation.    Robert Walsh is also a Chapter 11 Debtor in Possession with his case pending before this Court.

6.      WSI is represented in the aforementioned litigation by Stone & Magnanini, LLP, a prestigious and capable litigation firm.

6.      Stone & Magnanini is handling certain litigation pending in the United States District Court for the District of New Jersey, entitled Walsh Securities, Inc. v. Cristo Property Management, Ltd. et al, Civil Action 97-3496, ("the Litigation" or "the RICO Action") which Robert A. Magnanini, Esq. has handled since its inception in 1997.  The action seeks to recover direct, consequential and punitive damages arising from a residential real estate flipping scheme that defrauded the Debtor out of approximately 230 loans, over the course of at least sixteen (16)

2

months, with a total amount of approximately $24 million dollars in principal, and, as of 2007, over $45 million dollars in accrued interest, over $5.5 million in attorney's fees and costs, the loss of a sale of the company for over $420 million and finally, the destruction of the Debtor, with the loss of over 250 jobs in fourteen (14) offices in twelve (12) States.

7.    The action was first stayed, then administratively dismissed from June 9, 1998 until September 30, 2004, pending completion of numerous criminal prosecutions of many of the Defendants.  A Third Amended Complaint was filed on January 31, 2005 and a present Fourth Amended Complaint was filed on July 10, 2009.

8.    Discovery has been substantially completed in the Litigation.  The parties have attended multiple mediations and a settlement conference presided over by the Honorable Dickinson Debevoise, Judge of the United States District Court for the District of New Jersey. Judge Debevoise has advised the parties, that if the matters are not settled, the case will be assigned to a Judge, with instructions to proceed to trial of the issues in due haste.

### Claims Against Coastal Title Agency

9.    In connection with the litigation, WSI has asserted claims against Coastal Title Agency for civil RICO and common law fraud.  Coastal has filed an Answer denying any involvement in the RICO enterprise and denying that it committed fraud on WSI.

10.    Coastal served as title agent to Commonwealth Land Title Insurance Company, Nations Title Insurance Company of New York, Inc. and Fidelity National Title Insurance Company of New York (collectively the "Title Insurance Defendants") and ran title searches, issued binders, title insurance policies and closing service protection letters to WSI without which WSI would not have closed on any of the fraudulent loans at issue in the Litigation.  The

Title Insurance Defendants have filed crossclaims against Coastal for contribution and indemnification. Coastal has denied that it is liable to the Title Insurance Defendants for indemnification and contribution.

11.    Coastal was insured by General Star, which agreed to defend Coastal in the Litigation, under a series of reservation of rights letters. Coastal had an insurance policy of $1 million in effect for the time period which is the subject of the Litigation. The insurance policy was a "wasting policy" in that the costs of defense were deducted from the coverage. The coverage had been depleted to less than $500,000.00 during the thirteen (13) years of litigation. General Star has taken the position that Coastal's policy only covered negligence claims and not the intentional torts asserted by WSI. One of the grounds for the defense of the indemnification and contribution claims asserted by the Title Insurance Defendants is that claims against Coastal sound in tort, while the claims against the Title Insurance Defendants sound in contract.

12.    In addition to the inherent risk in any litigation and the wasting coverage, WSI has been advised by counsel for Coastal that a Bankruptcy Petition has been prepared for filing on behalf of Coastal, if the claims against Coastal cannot be settled.

13.    On January 11, 2011, after months of informal negotiations, WSI, the Title Insurance Defendants, Coastal and General Star entered into a mediation, under the supervision of Robert E. Margulies, Esq. of Margulies, Wind & Herrington.

14.    After extensive negotiations, WSI, Coastal, General Star and the Title Insurance Defendants agreed that a settlement of the claims against Coastal and its insured, General Star, for the amount of $425,000.00 is prudent and reasonable.

15.    To date, WSI and the Title Insurance Defendants have been unable to enter into a

4

"Global Settlement" of WSI's claims against the Title Insurance Defendants. WSI has recently communicated a settlement demand to the Title Insurance Defendants and has been promised a response by mid-May.

16.    To date, WSI and the Title Insurance Defendants have been unable to resolve their competing claims against the $425,000.00 of settlement funds to be delivered pursuant to the Coastal Settlement. If the parties remain unable to agree upon a consensual distribution of the Coastal Settlement proceeds, the parties have agreed to engage in a one half day mediation, in an attempt to reach agreement.

17.    A motion to approve the proposed settlement was heard by this Court and approved on May 23, 2011, with an order entered by the Court on May 25, 2011. Pursuant to said Settlement Agreement, the settlement proceeds will be held in escrow by Stone & Magnanini, LLP, pending a determination of the entitlement to such settlement proceeds pursuant to further order of this Court.

## THE CHEROKEE EQUITIES PLAN.

18.    Cherokee Equities filed its original disclosure statement describing a "plan of reorganization" for the Debtor on April 8, 2011. The premature filing of the original plan and disclosure statement contemplated a "reorganization" of a Debtor that has no operations or assets other than the litigation described above. The Original Plan, as well as the First Amended Plan, improperly and arbitrarily subordinates claims, and thus unfairly discriminates against similarly situated classes. The plan does not contemplate payment of all administrative claims in full, thus violating Section 1129(a)(9). Most importantly, because the outcome of the pending litigation against the title companies has yet to be decided, the plan is not feasible as there is no source of

funding as of yet, making the entire exercise of deliberating over the terms of a disclosure

statement and the plan solicitation process at this juncture a complete waste of time and money.

19.    For the reasons set forth below, the Disclosure Statement describing the Plan

cannot be approved.

## OBJECTION

## I.  THE DISCLOSURE STATEMENT DOES NOT PROVIDE ADEQUATE INFORMATION AND SHOULD NOT BE APPROVED BECAUSE IT OMITS INFORMATION THAT IS NECESSARY FOR CREDITORS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

**A.    Legal Standard.**

20.    Section 1125(b) of the Bankruptcy Code requires a disclosure statement to

provide adequate information to creditors:

> An acceptance or rejection of a plan may not be solicited after
> commencement of the case under this title from a holder of a claim or interest . . .
> unless, at the time of or before such solicitation, there is transmitted to such
> holder the plan or a summary of the plan, and a written disclosure statement,
> approved, after notice and a hearing, by the court as containing adequate
> information.

11 U.S.C. § 1125(b) (emphasis added).

21.    "Adequate information" is reviewed in terms of the information a reasonable

investor would need to make an informed judgment on the Plan:

> "[A]dequate information" means information of a kind, and in sufficient detail, as
> far as is reasonably practicable in light of the nature and history of the Debtor and
> the conditions of the Debtor's books and records, that would enable a hypothetical
> reasonable investor typical of holders of claims or interests of the relevant class to
> make an informed judgment about the plan.

11 U.S.C. § 1125(a). The Third Circuit Court of Appeals has stressed the importance of full

disclosure by stating:

[W]e cannot overemphasize the … obligation to provide sufficient data to satisfy the Code

standard of "adequate information." Oneida Motor Freight, Inc. v. United Jersey Bank (In re

Oneida Motor Freight, Inc.), 848 F.2d 414, 417 (3d Cir. 1988). See also sure-Snap Corp. v. State

Street Bank & Trust Co., 948 F.2d 869, 873 (2d Cir. 1991) ("11 U.S.C. § 1125(b) requires

Chapter 11 petitioners to file a mandatory disclosure statement listing all "adequate information"

which would enable holders of claims to take an informed position on a proposed reorganization

plan.").

22.    Additionally, "the plan, which is being described, [must] have sufficient depth so

that the Disclosure Statement provides the 'hypothetical investor' with the kind of information to

evaluate the risk of acceptance of the plan [;] [o]therwise, a detailed disclosure of a deceptive

plan might survive a disclosure statement hearing, and that was not the intent of Congress." In re

New Haven Radio, Inc., 18 B.R. 977, 979 (Bankr. D. Conn. 1982).

23.    Courts have defined a "reasonable investor" as "[a]n investor typical of the class

is one having such a relationship with the Debtor as other holders generally have and having

such ability to obtain information from sources other than the Disclosure Statement as other

holders of claims in the class have." In re Weiss-Wolf, Inc., 59 B.R. 653, 654 (Bankr. S.D.N.Y.

1986).

24.    A determination of whether a Disclosure Statement contains "adequate

information" is within the discretion of the bankruptcy court and must be determined on a case-

by-case basis. See Oneida Motor Freight, Inc., 848 F.2d at 417; In re Phoenix Petroleum Co.,

278 B.R. 385, 393 (Bankr. E.D. Pa. 2001); Abel v. Shugrue (In re Ionosphere Clubs, Inc.), 179

B.R. 24, 29 (S.D.N.Y. 1995).

25.    Although the term "adequate information" is not specifically defined, courts have

set forth a non-exclusive list of the type of information that should be included:

- The circumstances that gave rise to the filing of the bankruptcy petition;

- A complete description of the available assets and their value;

- The anticipated future of the Debtor;

- The source of the information provided in the Disclosure Statement;

- The condition and performance of the Debtor while in Chapter 11;

- Information regarding claims against the estate;

- A liquidation analysis setting forth the estimated return that creditors would receive under Chapter 7;

- The accounting and valuation methods used to produce the financial information in the Disclosure Statement;

- Information regarding the future management of the Debtor, including the amount of compensation to be paid to any insider, directors, and/or officers of the Debtor;

- A summary of the plan of reorganization;

- The collectability of any accounts receivable;

- Any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan;

- Information relevant to the risks being taken by the creditors;

- The actual or projected value that can be obtained from avoidance actions;

- The existence, likelihood and possible sources of non-bankruptcy litigation; and

- The relationship of the Debtor with any affiliates.

In re Cardinal Congregate I, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990) (quoting In re Scioto

Valley Mortgage Co., 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988)).  See also In re U.S. Brass

Corp., 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996).

26. Additionally, statements of mere opinion or belief are inadequate without accompanying factual support. In re Beltrami Enters., 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995) (conclusory allegations or opinions without supporting facts are generally not acceptable); In re Ferretti, 128 B.R. 16, 21 (Bankr. D.N.H. 1991) (statement that projection of restaurant's income and expenses was virtually impossible to provide but that Debtor believed plan to be feasible based on experience was inadequate); In re Egan, 33 B.R. 672, 676 (Bankr. N.D. Ill. 1983) (Debtor's Disclosure Statement failed to provide adequate information where rehabilitation plan was founded solely upon bare assertions of opinion without supporting facts); In re E. Redley Corp., 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982) (conclusory opinion of value is insufficient where value of assets is significant to plan).

27. As set forth below, it is readily apparent that the Disclosure Statement does not contain adequate information, does not comply with the Bankruptcy Code, and therefore cannot be approved.

**B.    The Disclosure Statement Does Not Provide Adequate Information Regarding the Funding of the Plan and the Many Speculative Risks Associated Therewith.**

28. The Original Plan filed by Cherokee Equities in Section 5.2.2 thereof gave the right to some arbitrarily appointed and undisclosed "Distribution Agent" to act as some sort of trustee, to be empowered to, among other things…" (iv) employ, retain, or replace professionals to represent it with respect to its responsibilities (including control of the RICO Action as the Debtor's authorized representative with full power to act in the Debtor's name)…" Cherokee's First Amended Plan attempts to remedy this deficiency by naming as "Liquidating Agent" an individual named Alton Kenney. This dangerous provision threatens to undermine the work of

9

professionals engaged in highly complex litigation over the course of 13 years, and proposes to introduce new professionals to undertake a costly and steep learning curve without any added value to creditors.  It also seeks to vest decision making authority over this complex litigation in someone other than the Debtor or a Trustee, an individual that is not acting in a fiduciary capacity and has no vested interest in the outcome of the litigation.  Most importantly, this "liquidating agent" and his substitute professionals will be ill-informed and unprepared to sufficiently step-in and hijack the pending litigation, jeopardizing the potential for maximizing the return to creditors on this significant investment of time and expense in such complex litigation.

31.    The lack of knowledge of the intricacies of the litigation is demonstrated by the dearth of information regarding the RICO litigation in the Disclosure Statement.   It would be better to wait until the litigation was concluded by way of settlement or trial in order to be in a position to inform creditors specifically, and not vaguely, (a) how much will creditors receive in payment on their claims and (b) when creditors can anticipate receiving such payments. Anything else is pure, unfounded speculation.  The Plan asks creditors to put their faith in an interloper to make decisions regarding complex litigation of which the Plan Proponent has demonstrated to know nothing about.

32.    There has been no description of any dereliction of duty, or other cause, to justify removal of the Debtor or its professionals from controlling the conduct of the pending litigation which the Debtor is in the best position to pursue to conclusion.  Indeed, the plan proponent is incapable of articulating such cause.  Such risks and speculation are clearly not adequately disclosed in the First Amended Disclosure Statement, thereby causing the First Amended

10

Disclosure Statement to be incapable of being approved. ("It goes without saying that an effective reorganization cannot be based solely on speculation."); In re Sound Radio, Inc., 93 B.R. 849, 855 (Bankr. D.N.J. 1988) ("Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises.") (internal quotations omitted); See In re Tavern Motor Inn, Inc., 56 B.R. 449, 455 (Bankr. D. Vt. 1985) ("Neither the Court nor creditors should have to perform acrobatic feats of financial analysis in order to make an informed judgment about a proposed plan. Nor should a creditor have to wait until an evidentiary hearing to learn that statements or objectives in the Plan are predicated on data that is simplistically or incorrectly stated."); In re Adana Mortgage Bankers, Inc., 14 B.R. 29, 31 (Bankr. N.D. Ga. 1981) ("The Disclosure Statement provides no financial information, data, valuations, or projections relevant to the determination by the Creditors of whether to accept or reject Debtor's Plan. Such financial information is the nature of that required under Section 1125 to constitute adequate information. . . . [C]reditors are entitled to a Disclosure Statement prepared by Debtor to which the Debtor is accountable. The creditors are not expected to be mind readers or clairvoyant. The basic financial information must be supplied in the statement.").

33.     Without adequate disclosure of the Plan's intention to appoint a disbursing agent to take control of litigation over which it knows nothing about and an explanation of the associated risks regarding control over the sole source of funding for the Plan, the Disclosure Statement does not provide adequate information, and cannot be approved.

**C.      The Debtor's Liquidation and Distribution Analyses Contain No Information Whatsoever.**

34.     On pages 22 and 23 of the Disclosure Statement, the plan proponent attempts to

meet the requirement for setting forth a distribution and liquidation analysis. Other than the

$425,000 settlement proceeds obtained by the Debtor over Cherokee's objections, the line items

all end in either "0" or "TBD". How can creditors make an informed decision on a plan which

provides no amounts to be disbursed, or amounts which have yet "to be determined"?

35.    As a result, the Disclosure Statement does not comply with 11 U.S.C. § 1125, and

cannot be approved.

**D.    The Disclosure Statement Does Not Provide Adequate Information Regarding Potential Avoidance Actions.**

36.    In the Disclosure Statement, the plan proponent merely states in passing that it is

not in a position to make any sort of evaluation of avoidance actions on behalf of the estate. It is

unclear from the Disclosure Statement whether (i) the plan proponent has even undertaken an

investigation as to whether any potential avoidance actions exist, (ii) any such avoidance actions

actually do exist that could be pursued by the Debtor and (iii) the potential value the pursuit of

these avoidance actions could bring to the Debtor's estate. Without the disclosure of such

information, the Disclosure Statement is inadequate and cannot be approved by this Court. See

Constr. Mgmt. Servs. v. Mfrs. Hanover Trust Co. (In re Coastal Group), 13 F.3d 81, 96 (3d Cir.

1994) (describing duty to disclose potential adversary proceedings against creditors before they

vote on a plan.); Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 416 (3d Cir.

1988) (holding that a Chapter 11 Debtor-in-Possession has a "statutory and fiduciary duty to

disclose [its potential claims against a creditor] during the pendency of the bankruptcy case"); In

re Cardinal Congregate I, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) ("[A]n identification and

discussion of all causes of action which the Debtor may pursue under the Bankruptcy Code or

other applicable law should be included in the Disclosure Statement").

E.     **Conclusion.**

37.     Based upon the foregoing, the Disclosure Statement fails to comply with 11 U.S.C. § 1125 and, as a result, should not be approved.

## II. THE PLAN IS UNCONFIRMABLE AS A MATTER OF LAW.

38.     When a plan to which a Disclosure Statement relates is incapable of confirmation by virtue of its defects, those defects may properly be raised as objections to the Disclosure Statement. In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001); In re 266 Wash. Assocs., 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); In re E. Me. Elec. Coop., Inc., 125 B.R. 329, 333 (Bankr. D. Me. 1991); In re Cardinal Congregate I, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990); In re Pecht, 53 B.R. 768, 769 (Bankr. E.D. Va. 1985); In re McCall, 44 B.R. 242, 243 (Bankr. E.D. Pa. 1984); In re Kehn Ranch Inc., 41 B.R. 832, 833 (Bankr. D.S.D. 1984).

39.     If a plan on its face cannot be confirmed, it is incumbent on a bankruptcy court to decline approval of the Disclosure Statement in order to prevent the diminution in the value of the estate that would result from the expense of soliciting votes and seeking confirmation of a patently unconfirmable plan.  In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).  See also In re Quigley Co., 377 B.R. 110, 115-116 (Bankr. S.D.N.Y. 2007); In re Century Inv. Fund VIII Ltd. P'ship, 114 B.R. 1003, 1005 (Bankr. E.D. Wis. 1990); In re Hirt, 97 B.R. 981, 982-83 (Bankr. E.D. Wis. 1989).

40.     As is set forth below, in addition to the fact that the Disclosure Statement fails to contain adequate information, the Plan suffers from countless fatal defects which make the Plan patently unconfirmable as a matter of law.

**A.**    **The Plan Violates 11 U.S.C. 11 U.S.C. § 1129(a)(1).**

41.    11 U.S.C. § 1129(a)(1) requires that a plan "comply with the applicable provisions of [Title 11]." 11 U.S.C. § 1129(a)(1). The plan, among other things, seeks to improperly subordinate claims. To do so without notice and a hearing would violate 11 U.S.C. § 510(c) which provides that the court may equitably subordinate claims "only after notice and a hearing." The Disclosure Statement does not describe any legal or factual basis for the subordination of one set of unsecured claims from another. The plan does so improperly, by segregating Class 2 Insider Claims from all other unsecured claims contained in Class 1, thus violating the provisions of Section 1122 in order to gerrymander an accepting impaired class. For these additional reasons the plan is not compliant with the provisions of the Code. Additional Code violations are set forth below.

**B.**    **The Plan Violates 11 U.S.C. § 1129(a)(2).**

42.    11 U.S.C. § 1129(a)(2) requires that the proponent of the plan comply with the applicable provisions of the Code. By proposing a plan which appoints an individual to act in a fiduciary capacity in making decisions about settlement of complex litigation he knows nothing about, the plan proponent seeks to bypass the requirements of Section 1104 of the Code regarding demonstration of "cause" for the appointment of a trustee. If a trustee is to be appointed in this case, it should be done by the US Trustee's Office, and not by a creditor with interests adverse to the Debtor and other creditors in this case. 11 U.S.C. Section 1104.

**C.**    **The Plan Violates 11 U.S.C. § 1129(a)(3).**

43.    11 U.S.C. § 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "Good faith" is not defined by the

14

Bankruptcy Code; however, Courts have defined good faith to require that "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.' " See, e.g., Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988) (quoting Koelbl v. Glessing (In re Koelbl), 751 F.2d 137, 139 (2d Cir. 1984)). See also In re Texaco Inc., 84 B.R. 893, 907 (Bankr. S.D.N.Y. 1988).

44.    In evaluating whether a plan has been proposed in good faith, a court "may consider a [plan proponent's] pre-filing conduct as well as the feasibility of the plan itself." Toy & Sport Warehouse, Inc., 37 B.R. at 149.  See also In re Leslie Fay Cos., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997). Cf. In re Resorts Int'l, 145 B.R. 412, 469 (Bankr. D.N.J. 1990) ("Term 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.")

45.    Here, it is readily apparent that the Plan was not proposed in good faith, thereby making it violative of 11 U.S.C. § 1129(a)(3).   In reality, the Plan is an attempt by the plan proponent to hijack the pending litigation, to settle for some amount sufficient to pay Cherokee's claim with no regard to the interests of other creditors or whether the litigation will proceed toward the fullest and maximum possible recovery for all creditors and interest holders. ***Indeed, interest holder Robert Walsh is a Chapter 11 Debtor in Possession in his own right, and owes a fiduciary duty to his own creditors to make certain that litigation proceeds flow to him as a creditor and as an interest holder in this case to use in funding his own Chapter 11 reorganization efforts.*** Cherokee's plan is bereft of this significant consideration.

15

46.    As a result, the Plan violates 11 U.S.C. § 1129(a)(3), and cannot be approved as a matter of law.

**D.    The Plan Violates 11 U.S.C. § 1129(a)(5).**

47.    11 U.S.C. § 1129(a)(5) requires that the proponent of the plan to disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a …successor to the Debtor under the plan.  11 U.S.C. § 1129(a)(5)(A)(i).  Section 5.2.1 of the Plan entitled "Disbursing Agent" states that the Proponent shall appoint "a person to act as Disbursing Agent for the purpose of making all distributions provided for under the Plan." Cherokee attempts to remedy the deficiency in Section 5.2.2 of the Plan by naming the individual to be given such unfettered powers, "including control of the RICO Action as the Debtor's authorized representative with full power to act in the Debtor's name."    No disclosures are made as to the qualifications, nor affiliations to the plan proponent or its counsel, nor compensation of this proposed successor to the Debtor.    Accordingly, the plan violates 11 U.S.C. § 1129(a)(5).

**E.    The Plan Violates 11 U.S.C. § 1129(a)(7).**

48.    11 U.S.C. § 1129(a)(7) is known as the "best interest of creditors" test. See Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988).  This section's application is limited to impaired classes of claims or interests and mandates that, in order for a plan to be confirmed: (1) every member of every class must have accepted it or (2) each member that voted against it must receive at least the liquidation value of its claims.  See 11 U.S.C. § 1129(a)(7). "Thus, under the best interests test, a court 'must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the Debtor were liquidated.' " In

re Drexel Burnham Lambert Group Inc., 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992) (quoting In
re Victory Constr. Co., Inc., 42 Bankr. 145, 151 (Bankr. CD. Cal. 1984)). Further, in comparing
the "value" that the creditor will receive under a plan to the liquidation value, the plan proponent
has the burden of demonstrating that the present value of the payment stream under the plan is
greater than the liquidation value. See, e.g., In re Union Meeting Partners, 165 B.R. 553, 572
(Bankr. E.D. Pa. 1994) subsequently aff'd, 52 F.3d 317 (3d Cir. 1995) ("payment stream under
the Plan must be reduced to present value for the purposes of the § 1129(a)(7) test").

49.    There is no meaningful liquidation analysis provided in the Disclosure Statement,
and thus it cannot be demonstrated that the Plan meets this test.  There is nothing to assure
creditors that the plan proponent's phantom "disbursing agent" would settle or prosecute the
RICO Action to a greater result than would the Debtor in Possession, or even a Chapter 7 Trustee
for that matter.  For these reasons, the Plan fails to comply with 11 U.S.C. § 1129(a)(7), thereby
rendering the Plan patently non-confirmable as a matter of law.

**F.    The Plan Violates 11 U.S.C. § 1129(a)(9).**

11 U.S.C. § 1129(a)(9) requires a plan to provide that, with respect to a claim of  a kind
specified in Section 507(a)(2) …,on the effective date of the plan, the holder of such claim will
receive on account of such claim cash equal to the allowed amount of such claim…"11 U.S.C. §
1129(a)(9)(A).  Claims specified in Section 507(a)(2) include administrative expense claims of
professionals allowed pursuant to Section 503(b).  The Amended Disclosure Statement provides
the following: "Proponent notes that satisfaction of Administrative Claims as of the effective
date of the Plan is required by the Bankruptcy Code and that adequate provision for their
payment must be demonstrated for the Plan to be confirmed."  However, the Amended Plan

makes no provision for payment of said claims. This is a patent violation of 11 U.S.C. § 1129(a)(9) making the plan non-confirmable on its face.[1]

**G.      The Plan Violates 11 U.S.C. § 1129(a)(11).**

43.     11 U.S.C. § 1129(a)(11) requires a plan to be "feasible." Pursuant to this section, a plan is deemed feasible if, post-confirmation, it "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor . . . unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). Thus, the court must scrutinize the plan to determine if there is a "reasonable assurance of success." Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988).

44.     In making a feasibility determination, courts consider:

(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 150 (Bankr. S.D.N.Y. 1984) (quoting In re Landmark at Plaza Park, Ltd., 7 B.R. 653, 659 (Bankr. D.N.J. 1980)). This list of factors is "neither exhaustive nor exclusive." In re Drexel Burnham Lambert Group Inc., 138 B.R. 723, 763 (Bankr. S.D.N.Y. 1992).

45.     It is well settled that a plan premised upon speculation and contingencies does not satisfy the Section 1129(a)(11) feasibility standard. See In re Mid-State Raceway, Inc., Case No. 04-65746, 2006 Bankr. LEXIS 3950, at *57 (Bankr. N.D.N.Y. Feb. 10, 2006) (quoting Pizza of

---

[1] It is just this sort of nonsense which causes administrative fees to rise. Undoubtedly, Cherokee will raise objections to fee applications complaining of fees generated by Debtor's counsel related to the need to respond to ridiculous filings such as the proposed plan and disclosure statement, objections to the proposed settlement of the Coastal litigation, objection to the proposed retention of special counsel, and similar nonsense to which the Debtor will likely need to respond throughout this case.

Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc., 761 F.2d 1374, 1382 (9th Cir. 1985))

("[T]he Court must 'prevent confirmation of visionary schemes which promise creditors and

equity holders more under a proposed plan than the Debtor can possibly attain after

confirmation.' "); In re Kent Terminal Corp., 166 B.R. 555, 562 (Bankr. S.D.N.Y. 1994) ("It

goes without saying that an effective reorganization cannot be based solely on speculation.").

See also In re Sound Radio, Inc., 93 B.R. 849, 855 (Bankr. D.N.J. 1988) (quoting In re Clarkson,

767 F.2d 417, 420 (8th Cir. 1985)) (" 'Sincerity, honesty and willingness are not sufficient to

make the plan feasible, and neither are visionary promises.' ").

46.     Here, the Plan, on its face, is not feasible. As noted above, the Plan is based upon

an unsupported projection of speculative, visionary future income that the plan proponent

wishfully hopes will result from litigation which has been pending for 13 years, without any

disclosure of the timing or amount or even the prospect of such payments.

47.     Without a pool of funds from which to make distribution, the plan is not feasible.

As a result, the Plan violates 11 U.S.C. § 1129(a)(11).

**H.      The Plan Violates the Absolute Priority Rule.**

56.      It is not possible for the plan proponent to  effectuate a cramdown approval of the

Plan because the Plan, among other things, violates the absolute priority rule,  as it is not "fair

and equitable" and therefore cannot be approved under 11 U.S.C. § 1129(b).

57.     Section 1129(b)(1) provides that a plan can be confirmed over the objection of a

class of creditors only if such plan (i) does not unfairly discriminate and (ii) is fair and equitable

to each impaired class of claims or interests that has not approved the plan. 11 U.S.C. §

1129(b)(1).

58.     The "fair and equitable" standard of Section 1129(b)(1) is also known as the "absolute priority rule." See 7 Collier on Bankruptcy ¶ 1129.04[4][a] [i] (16th ed.). As stated in Collier, the absolute priority rule provides that:

> A plan of reorganization may not allocate any property whatsoever to any junior class on account of the members' interest or claim in a Debtor unless all senior classes consent, or unless such senior classes receive property equal in value to the full amount of their allowed claims, or the Debtor's reorganization value, whichever is less.

Id; see also In re Geneva Steel Co., 283 F.3d 1173, 1180 n.4 (10th Cir. 2002) ("The absolute priority rule requires that certain classes of claimants be paid in full before any member of a subordinate class is paid.").

59.     Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where not all impaired classes of claims and equity interests accept a plan. This mechanism is known colloquially as "cram down."

Section 1129(b) provides in pertinent part:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Thus, under Section 1129(b), the Bankruptcy Court may "cram down" a plan over the non-acceptance of a plan by impaired classes of claims or equity interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes. See, e.g., In re Johns-Manville Corp., 843 F.2d at 650.

**A.      The Plan Unfairly Discriminates Class 2 Insider Claims from Class 1 General Unsecured Claims.**

60.      The unfair discrimination standard of Section 1129(b) ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly situated classes. In re Barney and Carey Co., 170 B.R. 17, 25 (Bankr. D. Mass 1994). Section 1129(b)(1) does not prohibit discrimination between classes; it prohibits only discrimination that is unfair. In re 11,111, Inc., 117 B.R. 471, 478 (Bankr. D. Minn. 1990).

61.      The weight of judicial authority holds that a plan unfairly discriminates in violation of Section 1129(b) of the Bankruptcy Code only if similar classes are treated differently without a reasonable basis for the disparate treatment. See In re Buttonwood Partners, Ltd., 111 B.R. 57 (Bankr. S.D.N.Y. 1990); In re Johns-Manville Corp., 68 B.R. 618. Accordingly, as between two classes of claims or two classes of equity interests, there is unfair discrimination if (i) the classes are comprised of similar claims or interests, see, e.g., Johns-Manville Corp., 68 B.R. at 636, or (ii) taking into account the particular facts and circumstances of the case, there is no reasonable basis for such disparate treatment, see, e.g., Buttonwood Partners, 111 B.R. at 63; In re Rivera Echevarria, 129 B.R. 11, 13 (Bankr. D.P.R. 1991).

62.      Neither the plan nor the Disclosure Statement articulates any legal or factual basis for the subordination of the general unsecured claims of so-called insiders from any other general unsecured claims in this case which can only be done after notice and a hearing. 11 U.S.C. Section 510 (c). Without such a justification, the plan discriminates unfairly as among these holders of general unsecured claims.

**B.      The Plan Is Not Fair and Equitable**

63.      Section 1129(b)(2) of the Bankruptcy Code defines the phrase "fair and equitable" as

follows:

(A)    With respect to a class of secured claims, the plan provides –
(i)(I) that the holders of such claims retain the liens securing
such claims, whether the property subject to such liens is
retained by the Debtor or transferred to another entity, to the
extend of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on
account of such claim deferred cash payments totaling at least
the allowed amount of such claim, of a value, as of the
effective date of the plan, of at least the value of such holder's
interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any
property that is subject to the liens securing such claims, free
and clear of such liens, with such liens to attach to the
proceeds of such sale, and the treatment of such liens on
proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable
equivalent of such claims.

(B)    As to Unsecured Creditors: Either (i) each impaired
unsecured creditor receives or retains under the plan property of a
value equal to the amount of its allowed claim or (ii) the holders
of claims and interests that are junior to the claims of the
dissenting class will not receive any property under the plan.

(C)    As to Equity Interest Holders: Either (i) each holder of an
equity interest will receive or retain under the plan property of a
value equal to the greatest of the fixed liquidation preference to
which such holder is entitled, the fixed redemption price to which
such holder is entitled or the value of the interest or (ii) the holder
of an interest that is junior to the nonaccepting class will not
receive or retain any property under the plan.

64.    In the instant case, the "fair and equitable" rule is not satisfied as to the holders of

Insider General Unsecured Claims in Class 2, and there has been no justification established

whatsoever for the subordination of such claims. As outlined in the influential case of Benjamin v.

Diamond (In re Mobile Steel Co.), 563 F.2d 692, 699-700 (5th Cir.1977), "three conditions must

be satisfied before exercise of the power of equitable subordination is appropriate:" (1) "[t]he claimant must have engaged in some type of inequitable conduct;" (2) "[t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;" and (3) "[e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code]." See also  United States v. Noland, 517 U.S. 535, 538-39, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (favorably citing the In re Mobile Steel Analysis); Citicorp II, 323 F.3d at 233-34 (same).  In re Winstar Communications, Inc., 554 F. 3d 382 (3rd Cir. 2009).

65.    "In three places in Section 1129(b)(2) . . . confirmation requires that a creditor or interest holder receive property 'of a value as of the effective date of the plan' equal to some amount, usually the allowed amount of the participant's claim. Congress was clear that the use of this term meant that courts were to calculate the 'present value' of the property." See, e.g., 7 Collier ¶ 1129.05[2] Again, it is axiomatic that the absence of a payment plan proposed in the Plan does not, and cannot, provide creditors with the "present value" of the full amount of their claims on the effective date, which the plan establishes as twenty-one days after the confirmation order.  Plan at Section 1.22.  There is no way this complex litigation will be resolved in such limited time.

66.    As a result, the proponent cannot "cramdown" the Plan over Class 2 objections, causing the Plan to violate 11 U.S.C. § 1129(b)(2), thereby further rendering the Plan unconfirmable as a matter of law.

I.    **Conclusion.**

67.    Based upon all of the foregoing material and irreparable defects to the First

Amended Plan, which defects make the Plan unconfirmable as a matter of law, the Court should

decline to approve the Disclosure Statement.

### III.    ARGUMENT IN SUPPORT OF STRUCTURED DISMISSAL UPON RESOLUTION OF LITIGATION

68.    Depending upon the results of any settlement or trial of the pending litigation, a

more timely, cost-effective and efficient manner of disposition of this case would be a structured

dismissal, as opposed to the cost, delays and expense of the plan approval process.

69.    Pursuant to Bankruptcy Code Section 1112, "on request of a party in interest, and

after notice and a hearing, absent unusual circumstances specifically identified by the court that

establish that the requested... dismissal is not in the best interests of creditors and the estate, the

court shall... dismiss a case under this chapter... if the movant establishes cause." A

determination of cause is made by the court on a case by case basis.  In re Albany Partners Ltd.,

749 F.2d 670, 674 (11th Cir. 1984).   The Court has wide discretion to employ its equitable

powers to dismiss a bankruptcy case.  In re Preferred Door Co., 990 F.2d 547, 549 (10th Cir.

1993); In re Sullivan Center Plaza 1 Ltd., 935 F. 2d 723, 728 (5th Cir. 1991) (whether cause

exists "rests in the sound discretion of the Bankruptcy Court").

70.    Once the Court determines that cause exists for dismissal of a Chapter 11 case,

the Court must evaluate whether dismissal is in the best interests of the creditors and of the

estate. See, In re Superior Sliding & Window, Inc., 14 F. 3d 240, 243 (4th Cir. 1994). The best

interests of creditors test is met where interested parties agree that dismissal is the proper

disposition of the case See, In re Mazzoccone, 183 B.R. 402, 411(Bankr. E.D. Pa. 1995).

71.    It is premature at this juncture to consider either a plan or structured dismissal

without resolution of the pending RICO Action, either by way of settlement or litigation to

24

conclusion.   However, the litigation should be allowed to be pursued to its conclusion by the people who have been involved in the complexities of this litigation that has been pending for 13 years, and not some interloping, Johnny-come-lately, who is not motivated to maximize the recovery from this litigation for anyone but himself.

## CONCLUSION

**WHEREFORE**, for all of the foregoing reasons, the Debtor respectfully requests that the Court decline to approve the First Amended Disclosure Statement, and provide the Debtor with such other and further relief as the Court deems just and equitable.

WASSERMAN, JURISTA & STOLZ, P.C.
Attorneys for Walsh Securities, Inc., Debtor


By: _____
        LEONARD C. WALCZYK

Dated:  June 29, 2011.